# Piollet et al. *versus* Simmers.

1. An owner of land abutting on a public highway has a right to use a portion of the highway for certain purposes, for a temporary period and in a reasonable manner.

2. In the cases where that right exists it is an absolute right, not subservient to the rights of the travelling public.

3. The lawful and reasonable exercise of such right, without negligence, imposes no liability to pay for damages resulting therefrom to a traveller upon the highway.

4. A property owner who has a lawful right to expose an object on or along a public highway within view of passing horses, for a temporary purpose, is bound only to take care that it shall not be calculated to frighten ordinarily gentle and well-trained horses.   He is not bound to guard against frightening skittish, vicious, timid, and easily frightened horses.

5. In an action against a person leaving an object on the roadside at which it is alleged that a certain horse taking fright, reared, fell, and died, causing in his fall personal injuries to the plaintiff, witnesses familiar with horses may be called upon to give their opinion based upon facts observed by themselves as to whether the object in question was calculated to frighten horses; whether the mere fall of the horse could have killed him; and whether a horse could have been frightened to death by the object in question.

6. The owners of property through which a highway ran were engaged in whitewashing their fence.   In order to do this they used a small barrel mounted on wheels, which was full of whitewash, and which was moved along from time to time as the work progressed.   This barrel was left standing, covered over with a cloth, and having a shovel projecting a short distance above its top all day Sunday on one side of the beaten track.   In an action against such property owners for an injury alleged to have been occasioned by a horse taking fright at this object:

*Held*, that the jury should have been instructed that unless there was something of an unusual and extraordinary character in the structure

[Piollet v. Simmers.]

and appearance of this apparatus which would naturally tend to frighten horses of ordinary gentleness and training, it was not negligence to use it, and that its reasonable use for no longer a time than was fairly required along the highway in whitewashing the defendants' fences would not subject defendants to liability even though some horses might or did take fright at seeing it.

7. In an action against a private citizen for leaving an obstacle in the road whereby plaintiff's horse has been frightened and caused injury, the defendants cannot set up as a defence the fact that the plaintiff was at the time driving on the highway for pleasure on Sunday.

8. In the above case, the plaintiff having been permitted to introduce evidence that other horses had been frightened by the same object, an offer of testimony on behalf of the defendants to show that those horses were skittish horses should have been held admissible.

March 19, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Bradford county :* Of January Term, 1883, No. 190.

This was an action on the case, by Alice Simmers against Victor E. Piollet and Joseph E. Piollet, to recover damages for injuries alleged to have been caused by the negligence of the defendants.

On the trial, before MORROW, P. J., the following facts appeared: The defendants are the owners of a large tract of real estate situated in Wysox, Bradford county, Pa. There are several roads running through their lands along which they had constructed post and board fences, which for over twenty years they had been accustomed to whitewash. In the spring of 1881 they had erected a new fence along one of these roads, on both sides of which they owned the land, and in the months of June and July of that year were engaged in whitewashing the same. The whitewash, a preparation of lime and salt mixed in boiling water, was prepared in a heater in the hog-pen of the defendants, a distance from the nearest point of the fence to be whitewashed of 130 rods. To get the whitewash to the fence for use a keg or barrel, two feet three inches high and fifteen inches in diameter, was placed upon a small four-wheeled wagon, the wheels of which were twelve inches and fourteen inches in diameter. The length of the wagon was three feet, and breadth two and a half feet. In the keg was a shovel, the handle extending above the keg a distance differently stated by the witnesses from a few inches to two or three feet. The outside of the keg was streaked with lime, and it was covered with a piece of canvas or dark carpet. The wagon, thus rigged, was taken to the hog-pen, the keg filled with the prepared whitewash and then drawn to the place of use, and placed by the side of the fence in the road

convenient of access, and as the work progressed was drawn along the fence.

On the afternoon of Saturday, July 9, 1881, this barrel or keg had been filled and taken to a point in this fence 275 rods from the hog-pen where the whitewash was prepared. At the close of the day it was still half full, and as the workman intended to resume work on Monday morning, he covered up the keg, and left it standing in a ditch at the side of the road. At this place the road is $45\frac{7}{10}$ feet wide. On the side next the fence being whitewashed there is a footpath from four to five feet wide, elevated above the road a foot or more. Next is a ditch about four feet wide, and from four to five inches below the travelled track. Then comes twenty-two to twenty-four feet of level smooth roadway, while the $13\frac{1}{2}$ feet remaining slope gradually downwards $2\frac{9}{10}$ feet to the fence on the other side, a little steeper near the road than for the remainder of the distance. The surface of the road and slope is composed of small gravel. There are no banks or dangerous places on this road at this point, or above or below it.

On Sunday, July 10, Henry Waters and the plaintiff left Towanda at 4 P. M. for a pleasure drive. After driving about fourteen miles they came, about 8 P. M., to the point in the road above described, where the plaintiff alleges the horse, becoming frightened at the defendants' truck and lime keg, became unmanageable, reared up, plunged sideways and a little ahead, fell down and died instantly. The wagon was overturned, and the plaintiff thrown under it with its weight upon her, thereby causing the injuries for which this action was brought.

The plaintiff offered to prove, by several witnesses, that the obstacle above described tended to frighten horses. Objected to by defendant because the question did not embrace the words ordinarily well-broken and road-worthy horses. Objection overruled. Exception. (First and third assignments of error.)

The plaintiff also offered to prove other cases in which horses had been frightened at the same object in the same position. Objected to by defendant. Objection overruled. Exception. (Second assignment of error.)

The defendants called J. G. Dougherty as a witness, who testified that he had had experience with horses for over twenty years, had owned quite a number, owned five at the time he was examined, had seen this horse shortly before his death the same afternoon, and had observed and described his condition, and had seen him immediately after his death. Defendants then asked him: "In your opinion, of what did

10 OUTERBRIDGE.—7

[Piollet *v.* Simmers.]

that horse die?" Objected to by plaintiff. Objection sustained. Exception. (Fourth assignment of error.)

Defendants then asked the same witness the following question : "In your opinion, was that tub calculated, placed upon the road as it was, to frighten an ordinarily well-broken road-worthy horse, or an ordinarily quiet and well-broken horse?" Objected to by plaintiff because it is not sufficient that the obstacle might not have frightened an ordinarily well-broken horse; but that the plaintiff has the right to the highway in such a condition that even skittish animals may be employed without risk. Objection sustained. Exception. (Fifth and sixth assignments of error.)

Robert Ferguson, another witness for defendants, testified that he had been a blacksmith for over fifty years, had "always handled horses more or less since he was big enough," and had seen horses frightened in various ways. He also testified that he had seen horses fall and thrown to the ground frequently. Defendants then proposed to ask witness the question whether the fall of this horse on its side straight out at full length could have killed it upon this piece of ground. Objected to by plaintiff as incompetent. Objection sustained. Exception. (Seventh assignment of error.)

Defendants then asked the same witness this question : "State to us your opinion whether a horse could be frightened to death at this object that was in the road." Objected to by plaintiff. Objection sustained. Exception. (Eighth assignment of error.)

The defendants also offered testimony to the effect that the horses that had been frightened by this obstacle were skittish horses. Objected to by plaintiff. Objection sustained. Exception. (Ninth assignment of error.)

The plaintiff presented, inter alia, the following points :

3. That in making such use of the highway the defendants were bound to a due regard to the rights of public travel and to the temper and disposition of horses used by the public. They had no right to leave any such object in the road as would frighten horses, and in this respect they were bound not only to leave the highway safe for dull, sluggish and gentle animals, but for spirited, timid and nervous animals as well.

Answer. This is true, as a general proposition. But we qualify it with the remark that where a horse is disposed to shy, and the driver of the horse is aware of the defect, he is obliged to use greater care than in driving a horse that did not have such a vice or defect; and in this case you must find that the driver exercised such care, or the plaintiff cannot recover. (Fourteenth assignment of error.)

4. That if the jury believe the object complained of in this

[Piollet *v*. Simmers.]

case, to wit, the whitewash barrel in the small cart or wagon spoken of by the witnesses, was an object likely to frighten horses and render public travel unsafe, it was negligence on the part of the defendants to leave it in the highway, and they are liable for any injury resulting from such negligence.

Answer. Affirmed.    (Fifteenth assignment of error.)

5. If the jury believe the defendants were negligent in leaving the object in the road, and that in consequence of such negligence the horse behind which the plaintiff was riding was frightened, whereby the plaintiff sustained the injuries complained of, she is entitled to recover damages for such injuries.

Answer. This is affirmed, with the further remark that the jury must find that the object was such as was well calculated to frighten the horse, and that, by reason of such fright, the plaintiff sustained the injuries complained of. (Sixteenth assignment of error.)

The defendant presented, inter alia, the following points:

1. That the plaintiff cannot recover because she was unlawfully upon the public road.

Answer. Denied.    (Twenty-third assignment of error.)

2. That for the purposes of building fences along the line of the public highways through the country, the farmers owning the lands through which such highways run have the lawful right to place stones, boards, posts, paint, lime, or other materials used within the limits of the highway and keep such materials there, for such time as is reasonable for the erection and completion of such fences, provided such materials are left in the most convenient manner, and a free and easy passage is left by it, for all business and travelling purposes.

Answer. This is a correct statement of the law, and, so far as it is applicable to this case, it is affirmed. But we will say that they would be answerable for injuries arising from an unreasonable or negligent use of these things upon the highway, in case injuries were received by any person. (Seventeenth assignment of error.)

3. That if the defendants were continuously engaged in whitewashing their fences from day to day, and used such means of getting their whitewash to the place of use, so the same would be easy of access and handy, as ordinarily careful and prudent men engaged in the same or similar business would use, then the plaintiff cannot recover, although the whitewash tub was an obstacle in the highway, but not obstructing or hindering the travel thereon.

Answer. Affirmed, provided you find the obstacle was such as was not calculated to frighten horses.    (Eighteenth assignment of error.)

4. If the defendants were engaged in whitewashing their fence on Saturday prior to the Sunday of the happening of the alleged injury, and at the close of Saturday there was whitewash in the tub for further use, and the defendants were intending to resume the work on Monday following, they had the lawful right to leave the tub within the limits of the highway during Sunday, provided it did not obstruct and hinder travelling upon the same.

Answer. This is affirmed by adding to the end of the point —" Provided it was not such an object as was calculated to frighten horses." (Nineteenth assignment of error.)

5. The general rule is : " A person is answerable in damages for the consequences of his fault, so far as they are natural and proximate, and therefore may have been foreseen by ordinary forecast. That by the laws of organized society, everybody must bear their misfortunes or accidents, and the results of actions and faults, when such results reach in their consequences beyond what may be foreseen by ordinary forecast. That by the laws of organized society the defendants are compelled to build fences along the line of highways running through their lands, and if in building such fences, by lawful means, and in a lawful manner such as ordinarily careful and prudent men would use in doing the same or similar work, and an injury is caused thereby, it must be ascribed to accident, one of the results of organized society which every person must bear for himself or herself, and the plaintiff cannot recover."

Answer. So far as this point is applicable to this case, it is denied. (Twentieth assignment of error.)

6. That if the lime tub in the highway, as shown in this case, is such means or method for taking the whitewash to the place it was to be used, as ordinarily careful and prudent men, doing the same or similar work, would have been likely to have used, then the frightening, falling and death of the horse and the consequent injury arising therefrom must be ascribed to accident, and the plaintiff cannot recover.

Answer. Refused. The question is—was it negligence on the part of the defendants to leave the lime tub and wagon in the highway ? If it was negligence the plaintiff can recover. (Twenty-first assignment of error.)

7. That if the horse behind which the plaintiff was riding at the time of receiving the alleged injury was skittish and in the habit of shying at objects in the highway, and was not quiet and well broken, then the plaintiff cannot recover.

Answer. Refused. But if the horse was skittish and the driver knew of it, he was bound to exercise such care as was necessary under the circumstances. If he did not exercise

such care, then the want of it so as to amount to contributory negligence, is matter of defence, and is upon the defence to show. (Twenty-second assignment of error.)

The court charged the jury, inter alia, as follows:—

" These defendants own the land on both sides of the road, as I understand, and as owners they had the right to whitewash their fences; they had the right to do whatever was necessary in or about their fences, and they had the right to use it to any extent they pleased, and to do what they pleased, to use that lime tub and wagon and leave it as they did, provided that in so using it they did not endanger the rights of others. They had the right and dominion over the land on both sides of the road, and in the road, subject however to the right of the public to travel as they might wish. Their rights, therefore, were relative. They had the dominion over the land, and the public had the right to pass and repass as they pleased; the road extended from fence to fence. Whatever was fenced out was public highway, and was dedicated to public use, and the public had the right to travel in any part of it they saw fit. (Tenth assignment of error.)

" The defendants had the right to use any part of this highway passing through their land, for the purpose of improving and building their fences or whitewashing them, provided they did not interfere with the rights of the public, the rights of travellers to pass and repass, so as to render it unsafe for them to pass and repass with their animals or otherwise. If you find that this lime tub and wagon, covered as it was, and left on the road as it was, from point to point, and left standing at any particular point for days, was calculated to frighten horses, then it was negligence on their part, because you and every other citizen had the right to pass there, without having your horses frightened by any obstruction placed on the highway. (Eleventh assignment of error.)

" The defendants had a complete right to take it and use it as they did, provided it was not such an obstruction or such an obstacle or object that it had the tendency and was calculated to frighten horses. If it had such a tendency, and remained in any one place, or even if it did not remain in any one place so very long, but only for a few days or a day or two—if it was calculated to frighten horses on account of its position near the track, or on account of the covering that was on it, or taking it altogether, if it was calculated to frighten horses, then we think it was negligence to use it, and the plaintiff would be entitled to recover. (Twelfth assignment of error.)

" The plaintiff had a right to travel in any part of the road coming home. They had a right to drive on that side of the

road, or in the middle of the road, or on the side of the road where this obstruction was ; they had a right to pass over any part of the public road ; whether they endangered themselves by travelling near that side is a matter for the jury to determine under all the circumstances ; they had a right to be there." (Thirteenth assignment of error.)

Verdict for the plaintiff for $1,868, and judgment thereon. Whereupon the defendants took this writ, assigning for error, inter alia, the admission of plaintiff's offers of evidence, and the refusal of defendants' offers, the answers to plaintiff's and defendants' points, and the portions of the charge of the court above quoted.

*W. T. Davies* and *Williams* (*Angle* and *Ellsbree & Son* with them), for the plaintiffs in error.—The right of an abutting property owner to occupy a portion of the public highway is equal and co-ordinate with the public use of the easement, and is not subordinate and subservient thereto : 2 Dillon on Mun. Corp., 679, 681, §§ 581, 585; Clark *v.* Fry, 8 Ohio St., 358; O'Linda *v.* Lothrop, 21 Pickering, 292; Underwood *v.* Carney, 1 Cushing, 285; Commonwealth *v.* Passmore, 1 S. & R., 219; Palmer *v.* Silverthorn, 8 Casey, 69; Mallory *v.* Griffey, 4 Norris, 277; Allegheny *v.* Zimmerman, 14 Norris, 293; Macomber *v.* Nichols, 34 Mich., 212; Baker *v.* Fehr, 1 Out., 70; Keith *v.* Easton, 2 Allen, 552; Kingsbury *v.* Dedham, 13 Allen, 186 ; Cook *v.* Charlestown, 13 Allen, 190. The defendants were only required to guard against frightening horses of ordinary gentleness, ordinarily well-broken, and road-worthy horses : P. W. & B. R. R. Co. *v.* Stinger, 28 P. F. S., 228; Mallory *v.* Griffey, 4 Norris, 277; Pittsburgh Southern R. R. Co. *v.* Taylor, 8 Out., 306; Foshay *v.* Glen Haven, 25 Wisc., 288; Morse *v.* Richmond, 41 Vermont, 435; Ayer *v.* Norwich, 39 Conn., 376; Card *v.* Ellsworth, 65 Maine, 547. All cases to the contrary apply to the duty of supervisors in keeping the road itself in repair.

*Rodney A. Mercur* and *John F. Sanderson* (*Edward Overton, Jr.,* with him), for defendant in error.—As to the right of an abutting property owner to obstruct the highway : Erie *v.* Schwingle, 10 Harris, 388; Grier *v.* Sampson, 3 Casey, 183; Born *v.* Plank Road Co., 5 Out., 334; Dillon on Mun. Corp., 1058, § 1032; vol. ii., 722, § 730; Wood on Nuisances, §§ 262, 255. The placing obstructions in the highway has been held to create liability in : Young *v.* New Haven, 39 Conn., 435; Bartlett *v.* Hooksett, 48 New Hampshire, 18 ; Morse *v.* Richmond, 41 Vermont, 435; Winship *v.* Enfield, 42 New Hampshire, 199; Chamberlain *v.* Same, 43 New

Hampshire, 358; Dimock v. Suffield, 30 Conn., 129; Little v. Madison, 42 Wisc., 643; Bennett v. Lovell, 12 R. I., 166; Foshay v. Glen Haven, 25 Wisc., 288; Ayer v. Norwich, 39 Conn., 376; Brookville v. Pumphrey, 59 Indiana, 78; Fritsch v. Allegheny, 10 Norris, 226. A highway must be so kept that even skittish animals may be employed without risk of danger on it: Lower Macungie Twp. v. Merkhoffer, 21 P. F. S., 280; Hey v. Philadelphia, 31 P. F. S., 50; Pittston v. Hart, 8 Norris, 391; Wharton on Negligence, § 100; Ring v. Cohoes, 7 Reporter, 726.

Mr. Justice GREEN delivered the opinion of the court, October 6, 1884.

The injury for which the present action was brought, was occasioned in a peculiar and unusual manner. The plaintiff and another were riding in a carriage along a public road, in the open country, at about eight o'clock in the evening of a day in the month of July, when suddenly the horse drawing the carriage reared, plunged a few steps forward, fell to the ground on the side of the road, and instantly died. In falling he upset the carriage, which fell upon the plaintiff and caused the injuries for which the suit is brought. The falling and death of the horse caused the overthrow of the carriage; but what was it that caused the falling and death of the horse? This is perhaps the true problem of the controversy, but the cause does not seem to have been tried with much reference to its solution. There was an object standing by the side of the road, and quite near to the beaten track, at the place where the horse fell, and it seems to have been assumed that the horse took fright at the sight of this object, and this caused him to rear and fall and die. But this is an unsatisfactory theory. We do not know whether horses ever die from mere fright. No evidence on the subject was received. Some testimony was offered by the defendants, to the effect that the horse could not have died of fright, and that his death was due to some other cause; but it was rejected by the learned court below, and that rejection constitutes the substance of several assignments of error. No post-mortem examination of the horse was made, and the cause of justice was thus deprived of what might have proved to be a most important aid in the determination of the catastrophe. No experts in farriery were examined. No veterinary or other medical authorities were invoked, and the case is really barren of testimony from which a satisfactory theory of the animal's death may be derived. It is notorious that horses, like human beings, die suddenly, and of similar diseases. Indeed one of the medical witnesses testified to that effect in

[Piollet *v.* Simmers.]

this case. If there were facts which indicated that this horse died from some sudden attack of disease, or opinions of intelligent witnesses to that effect, based upon facts observed by themselves, we think they should have been received in evidence. We think that both the witnesses, Dougherty and Ferguson, gave evidence which sufficiently qualified them to answer the questions proposed to them, but which were rejected. Dougherty had had much experience with horses for twenty years, had owned quite a number, owned five at the time he was examined; he had seen this horse shortly before his death, the same afternoon, and had observed and described his condition, saw him immediately after his death, saw the object which was supposed to have frightened the horse, and testified as to whether it was calculated to frighten horses. In view of all this we think the questions proposed to be put to him should have been allowed, the first one for the reasons above indicated, and the second for the reason hereafter stated. Ferguson was a blacksmith, had shod horses of many different kinds for over fifty years; had always handled horses "since he was big enough;" had seen horses frightened frequently; it was offered to prove by him that he had seen horses fall, and thrown to the ground many times, and then to inquire whether the mere fall of this horse could have killed him, having reference to the ground where he fell, the witness having seen it. We think he was sufficiently qualified to answer this question, and his opinion should have been received, and also on the subject whether a horse could have been frightened to death by the object at which this horse was supposed to have taken fright. Had the horse run away, and in that manner upset the carriage, there would have been more force in the objections to this testimony. But such was not the fact. He died instantly, and the cause which produced his death probably occasioned his fall, and it was his fall that upset the carriage. Now the actual physical fact or condition, which produced his death, cannot be known, and the *moral* condition, so to speak, is a mere matter of theory which requires illustration by the opinions of persons having experience in such matters. For these reasons we sustain the fourth, seventh, and eighth assignments of error.

Another question arose on the trial which is presented in several assignments. It relates to the character and qualities of the horse against whose fright precautions are required. It was contended by the defendant that the animal should be an ordinarily quiet and well-broken horse. This was denied by the plaintiff, who contended that an object should be such as would not frighten any kind of horses, whether quiet and well-broken, or skittish and shy. The court adopted the

latter view, and refused to allow the defendants to inquire whether the object in this case was calculated to frighten an ordinarily quiet and well-broken horse, or an ordinarily well-broken and road-worthy horse. The same idea was embodied in the answers to points, and in the general charge, where the thought was expressed in the more comprehensive form that if the object was calculated to frighten horses, without any qualification as to their disposition, it would be negligence to expose it to view. In this we think there was error.

There is a certain right of property owners, which we will discuss presently, to leave objects on or along a highway, in front of their premises, temporarily, and for special purposes, and where that right exists, it is of equal grade, before the law, with the right of travellers to journey on the highway. Hence in such cases the obligations of each class to the other are equal, and not superior, the one to the other. Each is bound to ordinary care toward the other, in the exercise of their respective rights, but not to care which is extraordinary. In the more particular application of this doctrine to a case like the present, we think the correct rule is, that a property owner who has a lawful right to expose an object, on or along a public highway, within view of passing horses, for a temporary purpose, is bound only to take care that it shall not be calculated to frighten ordinarily gentle and well-trained horses. And this seems to be the tenor of the authorities in the cases in which there has been a judicial expression on the subject. Thus in the case of Mallory v. Griffey, 4 Norris, 275, which was an action to recover damages resulting from the fright of a horse, occasioned by a large stone along the highway, our brother STERRETT said: "It was claimed that the stone was an object calculated to frighten an ordinarily quiet and well-trained horse, and that the defendant was chargeable with negligence in leaving it on the highway. This presented a question of fact which was properly submitted to the jury with the instruction that the plaintiffs could not recover unless they found, 'from the evidence that a stone or rock, such as was placed in, or near, the road by the defendant, was, in and of itself, an object calculated to frighten an ordinarily quiet and well-broken horse?'"

In Morse v. Richmond, 41 Ver., 435, it was held, that a town is liable for such accidents by fright as are the natural result of its neglect to remove any object of frightful appearance, so remaining deposited on the margin as to render the whole road unsafe for travel with horses of ordinary gentleness. In Foshay v. Glen Haven, 25 Wis., 288, the court said: "We adopt upon this subject the rule established by the supreme courts of Vermont, New Hampshire and Connecti-

cut, that objects within the limits of a highway naturally calculated to frighten horses of ordinary gentleness, may constitute such defect in the way as to render the town liable, even when so removed from the travelled path as to avoid all danger of collision."

In Ayer *v.* Norwich, 39 Conn., 376, CARPENTER, J., said: "In conclusion we are satisfied that the law is and ought to be so that objects within the limits of a highway which in their nature are calculated to frighten horses of ordinary gentleness, may be nuisances, which make the highway defective within the meaning of the statute."

In Card *v.* City of Ellsworth, 65 Maine, 547, the court said: "How far, if at all, the court would be inclined to admit the doctrine adopted in this discussion beyond the facts now before us, we cannot now decide. But in no case like this can a liability of the town exist, unless the object of fright presents an appearance that would be likely to frighten ordinary horses, nor unless the appearance of the object is such that it should be expected by the town that it naturally might have that effect, nor unless the horse was at least an ordinarily kind, gentle, and safe animal, and well broken for travelling upon our public roads." The rule is stated in the same way in the cases cited by the defendant in error. Thus in Bartlett *v.* Hooksett, 48 N. H., 18, SMITH, J., says: "But if objects are suffered to remain (except for the most temporary purposes), resting upon one spot, or confined within any particular space, within the highway, and are of such shape or character as to be manifestly likely to frighten horses of ordinary gentleness, injuries caused by the fright thus occasioned may properly be said to happen by reason of the obstruction or insufficiency of the highway, unless the person placing or continuing those objects upon the highway was, in so doing, making such use of the highway as was under all the circumstances reasonable and proper." To the same effect are Young *v.* New Haven, 39 Conn., 435; Dimock *v.* Suffield, 30 Id., 129.

It seems to us it would be difficult to state a rational rule on this subject unless it is accompanied with this limitation. For if persons are bound to guard against frightening skittish, vicious, timid, and easily frightened horses, it will not be possible to state any limit of precaution which will be a protection against liability. The reason is that there is nothing as to which it can be definitely said that such horses will not frighten. On this subject the language of our brother PAXSON, in the recent case of The Pittsburgh Southern Railway Co. *v.* Taylor, 8 Out., 306, is particularly apposite. He said: "The frightening of a horse is a thing that cannot be anticipated, and is governed by no known

rules. In many instances a spirited road horse will pass in safety an obstruction that a quiet farm horse will scare at. A leaf, a piece of paper, a lady's shawl fluttering in the wind, a stone or a stump by the wayside, will sometimes alarm even a quiet horse. I may mention, by way of illustration, that the severest fright I ever knew a horse to feel, was caused by the sunlight shining in through the windows of a bridge upon the floor." If a farmer may not have a barrel of cider, a bag of potatoes, a horse power, a wheelbarrow or a wagon, standing on his own premises by the side of a highway, except at the risk of having his whole estate swept away in an action for damages occasioned by the fright of an unruly horse, the vocation of agriculture will become perilous indeed. These views lead us to the conclusion that the court below was in error in its treatment of this subject, and we therefore sustain the first, third, fifth, sixth, eleventh, twelfth, fourteenth, and fifteenth assignments. We see no objection to allowing proof of specific cases of fright at this particular object, and therefore do not sustain the second assignment.

Another subject of complaint by the defendants is the restrained and limited manner of defining the defendants' rights adopted by the court, and their subordination, when stated, as rights of inferior grade to those of the travelling public, and therefore to those of the plaintiff. The defendants are farmers. They own a considerable body of land lying on both sides of the public road at the place where the accident happened. For some time before and after the accident they were engaged in whitewashing their fences, extending a considerable distance along the road. The road at this place was upwards of forty-five feet in width, the road-bed actually travelled being twenty-two feet wide. The distance from the track to the fence on the south side was $13\frac{1}{2}$ feet, and in this space there was a slope downwards of $2\frac{9}{10}$ feet, a little steeper near the road than for the remainder of the distance. The surface of the road and the slope was composed of small gravel. Next the fence was a raised foot-path, about four and a half feet wide, and next to the path was a ditch four feet wide, and four-tenths of a foot below the travelled track. In this ditch stood a small truck on wheels, about $2\frac{1}{2}$ by 3 feet, the wheels being twelve to fourteen inches high, and on the truck was a small barrel about fifteen inches in diameter and two feet three inches high. A pole or stick projected above it, the height of which above the barrel is differently stated by the witnesses from a few inches to two or three feet, and a small piece of carpet covered the pole and barrel. The outside of the barrel was streaked with lime, and the barrel itself contained the lime with which the whitewashing was done.

This is the object which, it is claimed for the plaintiff, caused the horse to frighten, and thereby produced his fall and death. It was moved along the road as the work progressed, and was left standing in the ditch from Saturday night to Monday morning, covering the Sunday when the accident occurred, partly filled with lime prepared for use.

The learned court did instruct the jury that the defendants had the right to use any part of the highway for the purpose of building and improving their fence, provided they did not interfere with the rights of travellers; and that, if the lime tub was calculated to frighten horses, it would be negligence to use it, because all citizens had a right to pass without having their horses frightened by any obstruction placed on the highway. The learned judge also said that the public had a right to travel over every part of the highway; that everything between the fences was highway, and the public had the right to use any part of it they saw fit. It seems to us this is not a sufficiently precise designation of the relative rights of the property owners and the public. As we understand the law, there is an absolute right in a property owner to use a portion of the public highway for certain purposes for a temporary period and in a reasonable manner, and this right may be exercised in derogation of the right of the travelling public. Thus in 2 Dill. on Municipal Corporations, § 581, the writer says: " We have heretofore shown that the primary purpose of a street is for passage and travel, and that unauthorized and illegal obstructions to its free use come within the legal notion of a nuisance. But it is not every obstruction, irrespective of its character or purpose, that is illegal, even although not sanctioned by any express legislative or municipal authority. On the contrary, the right of the public to the free and unobstructed use of a street or way is subject to reasonable and necessary limitations. The carriage and delivery of fuel, grain, goods, etc., are legitimate uses of a street, and may result in the temporary obstruction to the right of public transit. So the improvement of the street or public highway itself may occasion impediments to its uninterrupted use by the public. And so of the improvements of adjoining lots by digging cellars, by building, etc.; this may occasion a reasonable necessity for using the street or sidewalk for the deposit of material. Temporary obstructions of this kind are not invasions of the public easement, but simply incidents to, or limitations of it. They can be justified only when and only so long as they are reasonably necessary."

In the case of Commonwealth *v.* Passmore, 1 S. & R., on p. 219, TILGHMAN, C. J., said: " No man has a right to

throw wood or stones into the street at his pleasure. But, inasmuch as fuel is necessary, a man may throw wood into the street for the purpose of having it carried to his house, and it may lie there a reasonable time. So, because building is necessary, stones, bricks, lime, sand, and other materials, may be placed in the street, provided it be done in the most convenient manner."

The foregoing case was an indictment for a nuisance, where the question was simply whether the obstruction in question was a nuisance; but the case of Palmer *v.* Silverthorn, 8 Cas., 65, was an action to recover damages for the broken leg of an ox which had wandered among a parcel of building materials, placed by the defendant in the highway in front of his premises while erecting a building. Here a practical question of liability for damages arose, and it was determined for the defendant, because, although his materials were an obstruction to the street, they were lawfully there, and he was not responsible if he left sufficient room for the travel of the street. The case of Commonwealth *v.* Passmore was cited and approved, and a similar case from 1 Denio, 524, was quoted, in which the same doctrine was declared. THOMPSON, J., said the necessity of the case was probably the foundation of the rule, "but the practice has become a custom of such long standing that it is regarded as law, and the right will not be defeated by an investigation into the necessity of so doing in any particular case. It is a right to be exercised under responsibility for all injury arising from an unreasonable or negligent use of it." In Mallory *v.* Griffey, *supra*, which was an action for damages for an injury inflicted by a horse taking fright at a stone placed in the highway as a part of some building materials to be presently used, we affirmed the court below in charging that the defendant was not liable, although the horse took fright, merely because the stone was in the highway. Mr. Justice STERRETT said: "The jury were properly instructed that the defendant might place building material on a portion of the highway, and permit the same to remain there for a reasonable length of time for the purpose of erecting his barn on the line of the road, without on that account alone incurring liability for injuries sustained by persons passing along the road, provided ample room was left for the free passage of vehicles and animals; but he would be liable for injuries occasioned by an unreasonable or negligent use of the highway." All this doctrine was repeated by the present Chief Justice in the case of City of Allegheny *v.* Zimmerman, 14 Norr., 287, who further said: "But the right to partially obstruct a street does not appear to be limited to a case of strict necessity; it may extend to purposes

[Piollet *v.* Simmers.]

of convenience or ornament, provided it does not unreasonably interfere with public travel."

The substance of the doctrine is that the mere exercise of the right of obstruction for a lawful purpose, imposes no liability to pay for damages resulting therefrom. It must be an unreasonable or negligent exercise of the right, in order to impose liability. To say that a man may lawfully deposit bricks and lumber on the highway, in front of a lot on which he is erecting a building with those materials, and yet if their presence has a tendency to frighten horses, and some oversensitive horse does take fright at them and run away and cause damage, the person depositing the materials is guilty of negligence, and shall pay the damage, is merely giving a right with one breath and taking it all away with another. In practical effect such a right would be no right at all. Any pile of bricks, stones, sand, lumber, or other building material, in a street, *has a tendency* to frighten horses, and in almost any community there could always be found some horses that would actually take fright at seeing them. But that circumstance alone will not take away the right to deposit them in such a place. There must be some abuse of the right, some unusual and extraordinary mode of arranging the materials, such as will probably produce fright with ordinarily gentle and well-trained horses, before it can be fairly said liability arises. So in the present case. The defendants were whitewashing their fences, a perfectly proper and legitimate thing to do. The fence extended along a great length of the public road, and the process of whitewashing necessarily occupied considerable time. In this respect there does not seem to be anything unreasonable in the case. They used a small barrel to contain their material, the whole size of the vessel and its supporting truck not exceeding $2\frac{1}{2}$ by 3 feet superficially, and 3 feet perpendicularly. It is difficult to see anything unreasonable or negligent in using such an apparatus. It stood by the side of the travelled track, and made no encroachment upon it of any kind. It therefore did not obstruct the highway so as to interfere with the travel upon it. It seems to us the jury should have been told that unless there was something of an unusual and extraordinary character in the structure and appearance of this apparatus, which would naturally tend to frighten horses of ordinary gentleness and training, it was not negligence to use it, and its reasonable use for no longer time than was fairly required, along the highway in whitewashing the defendants' fences, would not subject the defendants to liability, even though some horses might or did take fright at seeing it.

These views require us to sustain, as we do, the tenth,

eleventh, twelfth, thirteenth, fourteenth, sixteenth, eighteenth, nineteenth, twentieth, and twenty-first assignments. We do not sustain the twenty-second, because it is of too limited a scope to cover all the conditions of liability; nor the twenty-third, because the presence of the plaintiff on the road on Sunday is not a defence which can be set up by a private citizen against a possible liability, if established by the other facts of the case: Mohney *v.* Cook, 2 Cas., 342; Rauch *v.* Lloyd, 7 Cas., 369. We sustain the ninth assignment, for the reason that evidence being admissible to show the frightening of particular horses at sight of this object, it is competent to show that those horses were not of ordinary gentleness and training.

Judgment reversed and venire de novo awarded.