GEORGE B. CARLISLE, Administrator, Appellant, v. SELLS-FLOTO SHOWS COMPANY, Appellee.

NEGLIGENCE: Acts Constituting—Obstructing Street with Circus
1  —Evidence. Unloading, under municipal license, a circus and attending paraphernalia in a public street, does not necessarily constitute a public nuisance, under Section 5078, Code, 1897. Evidence reviewed as to the manner in which the unloading in question was done, and held not to show negligence.

NEGLIGENCE: Acts Constituting—Menagerie on Public Street—
2  Odor of Animals—Fright of Teams. Taking a lawful thing upon a public street, with a degree of care commensurate with

the danger, excludes all basis for a charge of negligence, even though the thing so taken upon the street is liable to frighten horses thereon. So held as to a licensed menagerie, in brilliantly painted wagons and flapping, canvas, with an odor from the animals which was calculated to frighten horses.

**NEGLIGENCE:** Acts Constituting—Acts not Negligent Per Se— Necessity for Evidence. An act not negligent *per se* may not, manifestly, be denominated negligence, unless accompanied by evidence so showing. So held where negligence was sought to be predicated on the flapping of canvas on circus wagons, but the record revealed no evidence beyond the naked fact that there was a high wind.

**NEGLIGENCE:** Acts Constituting—Absence of Barricades and Warnings—Self-Evident Dangers. Omitting barricades and warnings furnishes no basis for a charge of negligence, when the dangers sought to be guarded against are equally evident to everybody. So held where deceased was killed by a team frightened by the unloading of a menagerie.

**NEGLIGENCE:** Acts Constituting—Attractive Nuisance—Unloading Menagerie. Negligence may not be pronounced on the mere act of unloading a menagerie from railway cars in proximity to a schoolhouse.

**PLEADING:** Amendments—Belated Amendments. Amendments setting up *new* claims and issues, filed *subsequently to the overruling of a motion for a new trial*, without the express or implied authorization of the court, and without the knowledge or consent of opposing counsel, are wholly unauthorized and properly stricken on motion. So held, where an amendment so filed embraced several new and distinct grounds of negligence.

**PLEADING:** Motions—Motion to Strike—Negligent Delay. A delay of some four months in moving to strike an unauthorized pleading will not be considered dilatory, when counsel, until the expiration of said time, had no reasonable occasion to know that such a pleading had been filed.

*Appeal from Polk District Court.*—Wm. H. McHenry, Judge.

Monday, June 25, 1917.

Action for damages to the estate of a child seven years old, killed by a team which was frightened by the un-

loading of the paraphernalia of a circus and the accompanying menagerie into the street, resulted in a directed verdict for defendant, and judgment thereon.    The plaintiff appeals.—*Affirmed.*

E. C. *Corry* and *Nesbitt & Johnston,* for appellant.

*Carr, Carr & Evans,* and *John T. Bottom,* for appellee.

LADD, J.—I.    The defendant is a corporation organized under the laws of Colorado, and engaged in the business of making circus and menagerie exhibitions in different cities of the country, traveling by railway.    It entered the city of Des Moines, May 17, 1906, having obtained a license from the city authorities to parade the streets and give an exhibition, and proceeded to unload from the train, in Southeast Fifth Street, where it crosses the tracks of the Chicago, Burlington & Quincy Railway Company, horses, wagons, light and heavy, tents and other accoutrements, elephants, camels, and animals in cages on wagons, some of them with canvas flapping.    The wagons were run from the ends of the flat cars over plank· to the ground, pulled into the street north of the tracks, and backed on each side of the street.    Animals were making the usual noises ˙on being disturbed.    A number of wagons were left south of the tracks on the west side of the street, and on the east side, near the unloading, were the spectators, among whom was Roscoe Carlisle, seven years of age, who had left home at about 8:30 A. M.    About this time, one Ungles approached from the north, driving a team of horses attached to a bakery wagon, and, when about 40 or 50 feet north of the tracks, he was signaled to stop, by the person superintending the unloading.    After the wagon being taken from the cars was hauled to the north past Ungles's team, the superintendent motioned him to proceed.    The horses, though gentle, were excited and had been rearing about; and, as Ungles loosened the reins, they· plunged forward, and ran

at full speed for some distance before he regained control of them. As they neared where the decedent was standing, he undertook to cross the street, apparently to avoid them, and was run down, and so seriously injured that he died. the same day.

It was made to appear that the odor of wild animals caused fear in horses; that the street was one of those most traveled in the south part of the city, and of unusual width between the curbs; that there were no ropes nor barricade, along the street, nor guards on the ground to warn spectators or drivers of danger; and that, after the wagons were placed in the street, teams of 2, 4, 6, or 8 horses were hitched to the wagons, and these hauled to the grounds for the exhibition, on East Twentieth Street. This is a suit to recover damages to the child's estate consequent on his death; and, as a verdict was directed for defendant, the sole inquiry is whether the evidence was sufficient to carry to the jury the issues raised.

1. NEGLIGENCE: acts constituting: obstructing street with circus: evidence.

The grounds of negligence charged in the petition are .that defendant, "disregarding its duty to protect the citizens and public from dangers resulting from the nature of unloading show equipment, animals, etc., and disregarding its duty to keep the street in a reasonably safe condition, did carelessly and negligently commit a nuisance by unloading the same in the street without providing any safeguard to the public whatever, and without providing any agents or employees to warn the public, or to prevent the children from the school near by to be attracted on 'the street and subjected to the dangers necessarily arising from the unloading of the brilliantly painted wagons, filled with animals, on the street."

What seems to be charged is the commission of a public nuisance by obstructing or incumbering a public street otherwise than by fences or buildings. Sections 5078,

5081, Code. If so, it is plain that the evidence was not such as to warrant an affirmative finding on the allegations. Such exhibitions are not necessarily unlawful. Power to regulate, license or prohibit circuses and menageries is expressly conferred on cities and towns. Section 703, Code. Only when given in disregard of the exercise of this power can they be said to be unlawful. The defendant had obtained a license from the city authorities to parade its streets and to give exhibitions. The latter were to take place on grounds at the corner of Grand Avenue and East Twentieth Street. The train containing paraphernalia of the circus and the menagerie was on the side track of the Chicago, Burlington & Quincy Railway Company, south of what are known as the old depot grounds, and was being unloaded by hauling the wagons to the ends of the cars, and then on plank extending from the ends to the ground in Southeast Fifth Street. The main track also was on this side of the grounds, while another side track extended north thereof, and, as we understand it, a spur track ran across said grounds. The depot was unoccupied. The area of the grounds does not appear, though referred to by some as a vacant lot. A witness, George Eaton, well described the situation and the manner of unloading the cars:

"They were unloading some of the wagons from the cars, and a crowd of people standing around here and there and every place. They were unloading these heavy wagons. There was a canvas over most of them, and they were loading them from the east to Fifth Street. The car stood east of Fifth, and the gang plank ran down to the approach of the cars there and landed them on Fifth Street crossing, and trailed them over there north to the K. D. tracks, come across the K. D. tracks on both sides of the street. They had a couple of snub teams with snub ropes. I should think about 25 feet. A man walks on the edge of the car, and hooks the ring on the corner of the wagon;

another man driving the team from the back end of the
gangplank. A couple of fellows with poles guide the wag-
ons as they came along, and another fellow there with a
team to haul them up. Fifth Street was paved to the Q.
tracks. When they came down into the paved street, they
generally stopped the wagons within 7 or 8 feet of the
gangplank with the snub rope. They had an extra team
there to snap on them to pull them away. As these wagons
came off of the cars, they snap an extra team and pull them
up the road north as far as the K. D. tracks. Then they
hooked 4 to 6 and 8 head of them to pull them to the
ground. I never paid any attention as to how long any par-
ticular wagon was left, but there was, I should judge, 15
or 20, and maybe more wagons standing there at a time,
from the time they began until they got them all off. There
were not so very many people on the west side of the street
where I was standing, but there was quite a few on the
east, men, women and children."

Ponies had been placed on the depot grounds—how
many does not appear. It is apparent that the wagons
must have been unloaded from the ends of the cars; for,
without the great inconvenience of turning on the car,
these could not have been taken from the side, and, as the
tracks were considerably above the surface on either side
except at the crossing, they must have been taken down
on the street, if unloaded at the ends of the cars. As they
were to be hauled away to the show ground as soon as the
facilities had would permit, it ought not to be said that de-
fendant was negligent in backing the wagons to the curb-
ing on either side of the street, with tongues diagonally
toward the center, so that the 2, 4, 6 or 8-horse teams might
be conveniently attached thereto when hauling them away.
The way between these rows of wagons appears to have
been kept open, save during the process of lowering from
the cars, and occupancy of the street during these brief

intervals could not well have been avoided. To have hauled the wagons therefrom over on the depot grounds, and shortly thereafter to have attached the teams thereto and hauled them back again to the highway, would seem useless, and not calculated to relieve the situation or to have rendered passing along the street less dangerous. Indeed, it would seem that such a course would have tended to create confusion and would have increased the danger in the making use of the street. The system, while making full use of the street, had the virtue of simplicity, and, in so far as the record discloses, the unloading proceeded in an orderly fashion and with great rapidity. Besides, there is nothing in the record indicating that the depot grounds were suitable for use for storing the wagons thereon, or that they were large enough for handling them and the many horse teams thereon.

But it is said that the odor from the animals, the noises by them emitted, were calculated to frighten the horses; and this was proven to be so. That something is calculated to scare horses, however, will not require it to be kept from the street. Running a wheelbarrow or engine or other vehicles on the street has that tendency. In *Bostock-Ferari Amusement Co. v. Brocksmith,* (Ind.) 73 N. E. 281, the judgment defendant's employee was leading an ugly-looking but docile bear, securely chained, along the street, when complainant's horse became frightened, and in a suit, he recovered for consequent damages. In reversing the judgment, the court, speaking through Comstock, C. J., said:

2. NEGLIGENCE: acts constituting: menagerie on public street: odor of animals: fright of teams.

"The liability of the appellant must rest on the doctrine of negligence. The gist of the action as claimed by appellee is the transportation of the bear, with knowledge that it was likely to frighten horses, without taking precaution to guard against fright. An animal *ferae naturae,*

reduced to captivity, is the property of its captor. 2 Black. Comm. 391, 403; 4 Black. Comm. 235, 236. The owner of the bear had the right to transport it from one place to another for a lawful purpose, and it was not negligence *per se* for the owner or keeper to lead it along a public street for such purpose. *Scribner v. Kelley,* 38 Barb. 14; *Macomber v. Nichols,* 34 Mich. 212 (22 Am. Rep. 522); Ingham on Law of Animals, 230. The conducting of shows for the exhibition of wild or strange animals is a lawful business. The mere fact that the appearance of a chattel, whether an animal or an inanimate object, is calculated to frighten a horse of ordinary gentleness, does not deprive the owner of such chattel of his lawful right to transport his property along a public highway. *Macomber v. Nichols,* supra; *Holland v. Bartch,* 120 Ind. 46 (22 N. E. 83, 16 Am. St. Rep. 307); *Wabash, etc., Co. v. Farver,* 111 Ind. 195 (12 N. E. 296, 60 Am. Rep. 696); *Gilbert v. Flint, etc.,* 51 Mich. 488 (16 N. W. 868, 47 Am. Rep. 592); *Piollet v. Simmers,* 106 Pa. 95 (51 Am. Rep. 496). One must use his own so as not to unnecessarily injure another, but the measure of care to be employed in respect to animals and other property is the same. It is such care as an ordinarily prudent person would employ under similar circumstances. This is not inconsistent with the proposition that, if an animal *ferae naturae* attacks and injures a person, the negligence of the owner or keeper is presumed. The evidence is that the horse was of ordinary gentleness, but this fact would not deprive the appellant of the right to make proper use of the street. If the bear had been carelessly managed, or permitted to make any unnecessary noise or demonstration, it would have been an act of negligence. It is not uncommon for horses of ordinary gentleness to become frightened at unaccustomed sights on the public highway. The automobile, the bicycle, the traction engine, the steam roller, may each be frightful to

some horses, but still they may be lawfully used on the public streets. King David said, 'An horse is a vain thing for safety.' Modern observation has fully justified the statement. A large dog, a great bull, a baby wagon, may each frighten some horses, but their owners are not barred from using them upon the streets on that account. Nor, under the decisions, would the courts be warranted in holding that the owner of a bear, subjugated, gentle, docile, chained, would not, under the facts shown in the case at bar, be permitted to conduct the homely brute along the public streets, because of his previous condition of freedom."

In *Scribner v. Kelley*, 38 Barb. (N. Y.) 14, a like doctrine was applied to an elephant.

"Wild animals collected and moved about the country for exhibition are always more or less likely to frighten domestic animals, but they may, nevertheless, be lawfully taken on the public highway under proper precautions." *Macomber v. Nichols*, 34 Mich. 212.

3. NEGLIGENCE: acts constituting: acts not negligent *per se*: necessity for evidence.    All exacted of defendant in unloading the train, or in hauling the brilliantly painted wagons and the animals along the street, was that ordinary care—that is, that degree of care commensurate with the danger therein—be exercised; and a thorough examination of the record before us has not disclosed any omission to do so. Owing to the distance to the show ground, the unloading proceeded faster than the wagons were drawn away; but these could not well be precisely timed, and the circumstance that 15 or 20 wagons, instead of a lesser number, stood at the street side, cannot be said to have increased the danger to passage. The matter of numbers could not be said to have determined the effect of the odor or noises on the passing horses. For all that appears, there is no room for saying that a brilliantly painted wagon or a sin-

gle caged tiger would not have produced as great fear in the passing team as if it had been accompanied by other wag- ons or by cages containing other animals. There was a high wind, and there appears to have been some flapping of canvas, but whether this was due to leaving parts flying, or too loosely drawing over the bows or frame, or some other cause, does not appear. How such canvas should have been secured, or whether the flapping was incident to the unloading of the cars, was not explained in evidence, and we are not ready to say that knowledge of these mat-. ters is so common as that the jurors are to be assumed to know without proof. It is possible that, owing to the heat of the summer, a portion of the covering was removed, and that the so-called flapping resulted from this. However this may be, certain it is that matters of this kind are in- cident to changes such as were being made, and, being tem- porary, are not, in the absence of other evidence, to be de- nounced as constituting negligence. There was no showing that wagons and their covering were other than are ordi- narily employed in transporting wild animals, nor that the unloading was done otherwise than in the usual manner. George Eaton was asked if this circus was different from any other, and answered:

"Why not so much as I could see, more than they were —seemed to be noisier, and practically a little later than the others. Q. They were in a little bigger hurry on ac- count of being a little late in the morning? A. I should judge that was their reason for being in a little bigger hur- ry. They were moving these wagons away pretty rapidly. As fast as they could get them off the car, they had an ex- tra team there, a man carrying doubletrees, and another man holding the lines. These 4 and 6 and 8 horses hauled these wagons up to Grand, and out to Twentieth. The cir- cus grounds was at East Twentieth. That was the regular circus ground. The manner of taking the wagons off the

cars was the same as I have always seen other circuses, practically."

Another criticism is that no barricade

**4. NEGLIGENCE: acts constituting: absence of barricades and warnings: self-evident dangers.** was placed to keep the people present back, or to warn them of the danger of passing teams. Though the license to parade and exhibit impliedly authorized the defendant to unload into the street for these purposes, it did not confer upon it the right to obstruct the street in so doing, further than essential in accomplishing the purpose. No danger from the mere unloading was shown to have menaced those present. They had the right to the use of the street, the same right as did defendant, and there was no showing whatever that they unduly obstructed the street or stood otherwise than they would had a rope or other obstruction been on the streets, or that defendant was authorized to exclude them therefrom by such means. Nor can it be said that any warning by agents or others was essential to apprise those present of the danger incident to their location. All stood on the street side, and, for all that appears, the child would have been as likely to have undertaken to escape from harm from the approaching team with a side barricade or rope as without. The situation was as apparent to those present as agents of defendant might have made it, and we are not inclined to say that defendant was lacking in care because of omitting the construction of a barricade or stretching a rope, or in not undertaking to warn people of danger which was as apparent to them as to the employees of defendant.

Appellant argues as though defendant's superintendent directed Ungles to drive his team through. He had no control over Ungles or his team, nor had he the right to dictate when and how he might use the street. All the superintendent undertook to do was to signal the team to stop until the wagon being taken from the car was hauled

out of the way, and when this was done, to signal that
the way was clear.  He cannot be said to have breached
his duty to Ungles or the public in any respect.  Whether
Ungles, in persisting in driving his team ahead under the
circumstances, was negligent, we have no occasion to de-
termine.

The criticism for unloading in the prox-

5. NEGLIGENCE:
acts constitut-
ing: attractive
nuisance: un-
loading menag-
erie.

imity of a schoolhouse and failing to pre-
vent the children from being attracted by
the unloading of the train would seem to re-
quire no attention.  As long as children
are curious to know, they will be attracted by the unusual,
and there is a well-grounded suspicion that, with respect to
the circus and menagerie, adults are not different; and it
would be casting entirely too great a burden on exhibitors
of animals to exact of them the prevention of the attracting
of young or old to whatever place these are being handled
or exhibited.  Nor does it appear that the deceased or those
present were exposed to the slightest danger by the mere
unloading of the animals.  This was done in a lawful man-
ner, and the injury resulted from the fright of a team, im-
providently driven, when known to be frightened, through
the zone of the odor and the noises of wild animals and
the unusual equipments incident to the giving of exhibitions
of the kind.  That such exhibitions are lawful is put be-
yond all question by the authorities, and, this being so,
the use of the street in the manner shown cannot be denom-
inated as wanting in the exercise of ordinary care, nor
within the prohibition of Section 5078 of the Code.  The
court rightly directed a verdict for defendant.

II.  On the day after the verdict, which,

6. PLEADING:
amendments:
belated amend
ments.

on motion, was directed for defendant,
counsel for plaintiff filed an amendment to
the petition, stating eight grounds of neg-

ligence. This was without having obtained leave of court, unless this happened by acquiescence. This amendment is included in the abstract, and, on August 15, 1916, counsel for defendant moved that the record be corrected by expunging said amendment and striking same from the files, on the grounds: (1) That the same was filed without leave of court; and (2) neither the defendant nor the court had knowledge of the filing of the same. This motion was sustained, and from the ruling, plaintiff has appealed. Several errors are assigned.

7. PLEADING: motions: motion to strike: negligent delay.

(a) The first is that appellee was dilatory in filing the motion. It appears that the original abstract was filed March 27, 1916, and plaintiff's brief, August 8th following, and counsel for appellee contends that their attention was first directed to this amendment upon reading of appellant's argument. The attorney who had entire charge of the case testified, in support of his motion to correct the record, that he was in California when the abstract was served, and, upon his return, stayed away from his office for some time, by direction of his physician, and that, upon beginning work again, other matters demanded attention, so that he did not examine the abstract until appellant's brief was served, and that, prior to that time, he knew nothing of the amendment's having been filed. Evidently counsel's delay in discovering the amendment and filing the motion to correct the record was excusable, if he was without knowledge that such an amendment was to be presented; for there was no occasion for giving the appeal attention until this was required in order to amend the abstract or prepare the brief in time for submission in this court.

(b) It is insisted, however, that both counsel and court had knowledge of what was to be included in the amendment, and that it would be filed before the court ruled on the motion to direct verdict. The attorney who

tried the cause for defendant and was present and orally argued this motion testified that he did not know that there was an amendment until he observed the printed copy in the abstract; that, if anything was said in oral argument about an intention of filing one, or the contents thereof, he was not present when this was done, and that the proposition to so file would have been so unusual that he would have remembered it had it been made. At appellee's request, the trial court made a statement as follows:

"When I ruled on the motion for a new trial, I had no knowledge there was any amendment on file at all. When I ruled on the motion to direct a verdict, I had no agreement or understanding with anybody that an amendment was to be filed whatever. I never make such an agreement with anybody, for it is surely difficult enough for a court to rule correctly upon things that are on file, and on which he has knowledge, and I would never attempt to rule upon allegations of negligence that were not made when ruled upon and were to be made in the future."

On the other hand, one of the attorneys for plaintiff swore that, in making oral argument, in resistance of the motion to direct a verdict, in the course of argument he said:

"We would want to amend our petition, setting out specifically the grounds of negligence. Not that I thought it was necessary, but in order that the grounds might be set out more clearly, and that the pleadings and the proof might conform in any event."

He stated also that he had a sheet of paper on which the said grounds to be included in the amendment were written, and read them to the court in presence of appellee's attorney. Another of appellant's attorneys testified that, in his argument, he directed attention to the evidence bearing on each ground of negligence alleged in the amendment, and urged these facts as being negligent acts, and that he attached to the motion for new trial a written argument

directing attention to all the grounds of negligence alleged
in the amendment, and that the court read the same.  He
also testified in corroboration of what the previous witness
had said concerning the filing of an amendment, as also did
another attorney.  But, though the grounds stated in the
amendment were referred to in the written argument at-
tached to the motion for new trial, the amendment was not
mentioned.  Nor was the court's attention called thereto
upon the filing of the amendment.  It will also be noticed
that nothing was said as to when the proposed amendment
was to be filed.  Nor does there seem to have been any rea-
son for delaying the filing thereof until after the ruling on
the motion to direct a verdict, for counsel had the noon re-
cess of two hours within which to prepare the paper, and,
as the ruling was made at about 3:30 o'clock in the after-
noon, probably time for that purpose would, on request,
have been allowed by the court.  It is not claimed that the
court granted leave or assented to the subsequent filing of
an amendment, save by acquiescence.  But for the motion
to strike, the amendment could not well have been con-
sidered.  *Hartkemeyer v. Griffith,* 142 Iowa 694.  Amend-
ment to answer may be filed only on leave, but, if filed with-
out leave, will not be stricken on motion, if leave might
properly have been granted upon application.  *Hanson v.
Cline,* 142 Iowa 187; *West Side Lumber Co. v. Hathaway,*
115 Iowa 654; *Rice v. Bolton,* 126 Iowa 654.  An amend-
ment to conform the pleadings to the proof is permitted,
even after verdict, and, as judgment is to be entered im-
mediately upon the return of the verdict, after the entry of
judgment.  *O'Connell v. Cotter,* 44 Iowa 48; *Cole v. Thomp-
son,* 134 Iowa 685; *Squires v. Jeffrey,* 101 Iowa 676; *Gray
v. Sanborn,* 178 Iowa 456; *Matthys v. Donelson,* 179 Iowa
1111; *Davis v. Chicago, R. I. & P. R. Co.,* 83 Iowa 744. Under
the guise of so doing, however, new claims, causes of action
or new issues may not be injected into the pleadings.  In

speaking on this subject in *Bicklin v. Kendall*, 72 Iowa 490, and referring to the section of the Code of 1873 of which 3600 is a copy, Beck, J., observed:

"Code Section 2689, which permits a party 'at any time' to amend his pleadings, contemplates that it shall be done pending the proceedings in the case, and not after the case is decided, the rights of the parties settled, and a judgment entered finally disposing of the questions involved. If a party may amend a pleading in nine months or a year after final judgment, he could do so in five or ten years. Judgments are settlements of controversies, and parties cannot be permitted to relitigate, after judgments, by filing new pleadings raising new issues. Amendments under the statutes, in proper cases, may be 'at any time' during the pendency of the action; but when there ceases to be a case for litigation, when the plaintiff's claim is merged in a judgment, and the rights of the parties involved in the issues are decided and settled by a judgment, then all pleadings must cease. It may be that after judgment an amendment may be permitted to conform a pleading to the proceedings, but this is very different from an amendment setting up new claims or new issues."

In *Harrington v. Christie*, 47 Iowa 319, the court refused leave to file an amendment, after verdict, alleging that annual interest had not been paid, and the court, in approving of the refusal of leave, said:

"It was not a mere amendment to make the pleading correspond with the proof. It was a material allegation upon which the defendant would have had the right to take issue."

These and the other cases cited indicate plainly enough that new issues or allegations of negligence may not be added by amendment to the petition, or new defenses to the answer, after submission or verdict, and that, at best, amendments then filed are only permissible to clarify these,

or make them more specific, and possibly add matters uncontroverted, or rectify an inadequate prayer, as in *O'Connell v. Cotter*, supra. The amendment in this case adds new and distinct grounds, as: (1) In unloading the wagons into the street and passing the team of Ungles while the canvas on the wagons was loose and flapping; (2) in moving the wagons over loose pieces of sheet iron on the flat cars, thereby making loud noises calculated to scare horses; (3) in motioning Ungles, when his team was frightened and trying to escape, to stop it in the street, and proceeding to unload the wagon in front of the frightened horses; (4) in beckoning Ungles to drive the team across the track when in a frightened condition and trying to escape, without attempting to assist the driver in controlling the team, or to protect the people; (5) in hauling the wagons taken from the cars past Ungles' team on the left-hand side of the road, contrary to Section 1569 of the Code; (6) in failing to unload the cars on the vacant depot grounds instead of into Fifth Street; and (7) "in collecting its wagons and other material on East Fifth Street when there was ample room to have collected the same on the open space on the old depot ground."

Some of these may touch the allegations in the original petition, but manifestly not for the purpose of clarifying or rendering these more specific. All, with the possible exception of the 4th and 7th, assert entirely new grounds of negligence, and for this reason, the amendment was not such as was permissible subsequent to verdict returned, unless, as contended by appellant, a proposition to so amend was made prior to the submission of the motion to direct; and, as to that, more later on. It was not an amendment to conform the pleadings to the proof, but to assert new grounds of negligence; and, though the evidence may have borne on some of these, all introduced was admissible and received on the allegations

of the petition. *Eikenberry v. Edwards,* 67 Iowa 14. To have granted leave to amend, and thereby to import these new issues into the case subsequent to the ruling on the motion, would have authorized the allegations to be changed after judgment. We entertain no doubt that to have granted leave to amend under these circumstances would have been bad practice and intolerable, in the absence of the consent or full acquiescence of counsel for the adverse party. If, for any reason, counsel has not been able to reduce to writing the amendment proposed, time should be allowed. Surely, the court, before making the decisive ruling in a case, should have exact knowledge of the precise issues being passed on, and as surely, is counsel entitled to be advised of what the claims of the adverse party are, before submitting his motion to direct. Only with such knowledge will he be able to conform his motion to the issues, or properly argue the questions involved. For these reasons, the court, as well as opposing counsel, might well have assumed that, if counsel suggested an amendment, this would be filed before the ruling on the motion to direct. It is urged that the court's remarks in ruling on the motion indicated that he was passing on the grounds found in the amendment said to have been proposed, but all said had a direct bearing on the allegations of the petition, and the matter of a possible amendment was not even hinted at. Even if some remarks might be construed as referring to grounds therein, these might well have been in response to arguments of counsel. In any event, the record contains no intimation of an intention on the part of counsel for appellant to file an amendment to the petition subsequent to the ruling on the motion to direct, and, even though there may have been talk of filing an amendment, both the court and counsel for defendant had the right to assume from the failure to do so that such purpose had been abandoned. One of the con-

sequences of argument often is that opposing counsel and litigants are convinced that their positions are fallacious, and, as a result, these are abandoned. We do not say that this was true of counsel for appellant, but the court and counsel for defendant had the right to rely upon this having been done. It must not be inferred that we are inclined to hold that a cause of action was made out on the issues raised by the amendment. We merely say that these were not before the court, and that, even though the matter of filing an amendment may have been mentioned by appellant's counsel, as claimed, it was to be inferred that this was intended to be done prior to the ruling, and that, in the absence of leave granted, the court and counsel for the adverse party had the right to assume that the purpose to amend had been abandoned. It follows that the motion to correct the record by striking the amendment was rightly sustained.

Motion to strike appellee's amendment to abstract is overruled.—*Affirmed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.